

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANCESCA VIOLA | ) | Case No.   **20      1439** |
| | ) | |
| *Plaintiff,* | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| JOSHUA BENTON | ) | |
| | ) | |
| And | ) | FILED |
| | ) | |
| PRESIDENT AND FELLOWS OF | ) | MAR 16 2020 |
| HARVARD COLLEGE (HARVARD | ) | |
| CORPORATION) | ) | KATE BARKMAN, Clerk |
| | | By_____ Dep. Clerk |
| *Defendants* | | |

### COMPLAINT - CIVIL ACTION

Plaintiff Francesca Viola ("Viola") by and through undersigned counsel, hereby states as follows in support of her Complaint against Defendants Joshua Benton ("Defendant Benton") and President and Fellows of Harvard College ("Defendant Harvard") (Collectively, "Defendants").

### Parties

1. Viola is an award winning, respected journalist and journalism professor whose career spans more than twenty years. She is an individual and resident of Fort Washington, Pennsylvania, in the County of Montgomery, and has been at all relevant times referenced herein.

2. Defendant Benton, an individual, is a journalist and the founder and director of the Nieman Journalism Lab ("Nieman Lab") which operates a website located at https://www.niemanlab.org and is owned by the Nieman Foundation for Journalism at Harvard University. At all times relevant herein, Defendant Benton was an employee

1

of Defendant Harvard and was acting within the scope of his employment. Upon information and belief, Defendant Benton is a resident of Massachusetts and has been at all relevant times referenced herein.

3.  Defendant Harvard is a private university based in Cambridge Massachusetts and has been at all relevant times referenced herein.

**Venue and Jurisdiction**

4.  This Court possesses federal diversity under 28 U.S.C. § 1332 as the parties are diverse in citizenship and the amount in controversy exceeds $75,000.

5.  Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2) because Defendant Benton purposely directed his tortious activities against Plaintiff toward the State of Pennsylvania and caused harm to her in this venue. *Dudnikov v. Chalk & Vermillion Fine Arts*, 514 F.3d 1063, 2008 U.S. App LEXIS 1870 (2008).

**Factual Allegations**

6.  Prior to initiating this litigation, the Parties agreed to an extension of the statute of limitations of Viola's claims through a tolling agreement which is still in effect through March 20, 2020.

7.  Beginning in 2004, Viola worked as a journalism professor in the Klein College of Media and Communication at Temple University ("Temple").

8.  Viola worked under a teaching contract that was renewed periodically throughout her employment without issue.

9. Prior to the actions of Defendant Benton in May 2018 that gave rise to this lawsuit, Viola enjoyed a successful career with Temple and had cultivated a stellar reputation in the Temple community which included earning a faculty merit award for exceptional performance on April 23, 2018.

10. On May 4, 2018, Nieman Lab published an article ("the Article") to its website titled, "People who are delusional, dogmatic, or religious fundamentalists are more likely to believe fake news." The article, attached hereto as **Exhibit A** can be found at the following URL: https://www.niemanlab.org/2018/05/people-who-are-delusional-dogmatic-or-religious-fundamentalists-are-more-likely-to-believe-fake-news/.

11. Nieman Lab uses an online public comment sharing platform called Disqus to allow readers to post comments to articles on the website.

12. Disqus is an application used by thousands of websites which provides a platform for users to post comments by creating an account using a name (the "Display Name") and email address.

13. Disqus permits users to choose their own Display Name which is visible to the public whenever they post a comment through the platform. Multiple users may choose to use the same Display Name which may be pseudonymous.

14. Visitors to any website that utilizes the Disqus platform for comments may click on the Display Name associated with any comment to see other Disqus comments associated with that user.

15. Websites that utilize Disqus as a comment platform are subject to the Basic Rules for
Discus-Powered Sites (the "BRDPS"), attached hereto as **Exhibit B**. The BRDPS state
the following:

> Disqus enables online discussion communities, and in doing so, freedom of
> expression and identity are core values of the Service. There are a number of
> categories of content and behavior, however, that jeopardize Disqus by posing
> risk to commenters, publishers, and/or third party services utilizing the Disqus
> platform.
>
> Websites or website representatives, including site moderators, publishing
> inappropriate content or exhibiting inappropriate behaviors in connection with
> their use of the Service may have their Disqus account and/or Disqus forum
> suspended or terminated.
>
> The following are not allowed on sites that use Disqus:
>
> . . . .
>
> • Deceitful data collection or distribution
>
>> User information is for moderation purposes only and collecting any
>> information in a misleading way is prohibited. Distribution of personal
>> identifiable information is prohibited,
>
> • Intimidation of users of the Disqus Service
>> Blackmail, extortion, extreme discrimination, and other forms of
>> threatening behavior are prohibited.

16. Users of Disqus are also subject to the Basic Rules for Disqus (the "BRD")(collectively
with the BRDPS, "the Disqus Policies") attached hereto as **Exhibit C** which prohibit
"posting personally identifiable information" and "targeted and systematic harassment
of people."

4

17. Users of Disqus must agree to the terms of the BRD, when creating an account prior to posting any comments.

18. As a website that uses the Disqus platform to moderate comments, Nieman Lab, and by extension Harvard, is bound by the BRDPS.

19. The Nieman Labs website is also bound by Defendant Harvard's privacy policy (the "Harvard Privacy Statement") which has been in effect throughout the relevant time period, and is linked to directly on every page of the Nieman Lab website and located at the following URL: https://www.harvard.edu/privacy-statement. It is attached hereto as **Exhibit D**.

20. The Harvard Privacy Statement states, unequivocally, that while user data may be collected, users of the website will "remain anonymous."

21. Viola had read and was aware of the Harvard Privacy Statement and relied on its promise of anonymity when using the Nieman Lab website.

22. Viola's reliance was reasonable and expected under the terms of the Harvard Privacy Statement which she understood were binding for use of the Nieman Lab website.

23. Viola maintained a profile on Disqus under the pseudonymous Display Name "truthseeker" (the "Truthseeker Account"). No publicly identifying information regarding Viola was disclosed through the use of this pseudonym and Viola chose to remain anonymous while posting comments using the Truthseeker Account.

24. Anonymous speech is a crucial and protected right of which Harvard University is well aware and has acknowledged extensively. See, e.g. The Harvard Cyberlaw Clinic website for reference: https://bit.ly/2PAo1fc ("Speech, Media Law & First Amendment Practice Areas"); https://bit.ly/2wLtHvR ("Protecting Anonymous Speech Under

5

California's Anti-SLAPP Law"); and   https://bit.ly/2wMrwZ7 ("Citizen Media Law Project and Cyberlaw Clinic Lead Amicus Effort Promoting Rights of Anonymous Online Speakers in IL").

25. On May 4, 2018, Viola posted a comment to the Article. Viola's comment was critical of both the Article itself and Nieman Lab. It was posted in response to another critical comment published under the Display Name, "Alexander Best." The Alexander Best comment is attached hereto as **Exhibit E** and stated the following:

> This is embarrassing journalism. Your headline suggests people who have religious views that are perceived as "fundamentalist"are equivalent to people who are "delusional." Your caveats on causation and correlation as the fine print does not elevate the sense that this article is just another illustration of "fake" news. And that is what is so sad about the entire topic. "Serious" Media have chosen the same methodologies of the people they disdain. I expect it from soap opera CNN but Nieman? If you are a lab for the future of journalism, that is really worrying. I appreciate the daily briefings. But this undermines the credibility of what in the inevitable speed of life and glut of data, is often just a fleeting headline. This makes me more likely to delete or unsubscribe. It is not just the poor quality of the journalism it is what it say about the Editor of this section. Eye, ball, off.

26. Viola's Truthseeker Account comment, is attached hereto as **Exhibit F** and stated the following:

> I am a journalism professor at a major east coast university and I completely agree with you. I follow Nieman but this is an article designed to insinuate that 1) Trump supporters who happen to be religious are delusional 2) conservative media that don't tout the democrat party talking points are disseminating 'fake news.' I will no longer use Nieman as a source.

27. Based on the assertions of the Harvard Privacy Statement, and the Disqus Policies, Viola had a reasonable expectation of privacy in making her comment to the Article through Disqus.

28. The email address of users who comment on websites using Disqus is accessible by the website administrators, but it is not accessible by third parties or visible to the general public.

29. In his capacity as Director of Nieman Lab, Defendant Benton had administrative access to view Viola's email address associated with the Disqus comment posted to the Article.

30. After reading Viola's critical comment, Defendant Benton used his administrative access to view Viola's email address and to discover Viola's true identity and the identity of her employer and professional colleagues, including her Dean.

31. Defendant Benton was also able to identify previous comments posted using the same Truthseeker Account on other Disqus powered websites.

32. In retaliation for Viola's pseudonymous Truthseeker Account comment, Defendant Benton sought to exact revenge and inflict harm on Viola personally and professionally by publishing a string of harassing and disparaging statements about her to his Twitter account (the "Twitter Statements") which revealed her identity in association with the Truthseeker Account. The Twitter Statements are attached hereto as **Exhibit G**.

33. Defendant Benton's Twitter account had thousands of followers at the time he published the Twitter Statements and his Twitter account description stated in part, "I run @niemanlab at Harvard."

34. Upon information and belief, Defendant Benton's animus toward Viola was motivated by his disdain for, and disagreement with, right leaning political views, such as those expressed by the Truthseeker Account.

35. Neither Viola's identity in association with the "Truthseeker Account" nor her identity as it related to her comment to the Article was of legitimate public interest or newsworthy.

36. Defendant Benton willfully and intentionally named Viola in his Twitter Statements to criticize, embarrass, and otherwise harass Viola.

37. The Twitter Statements also included mentions directed to the usernames of other Twitter users. Twitter mentions are a form of direct public communication with other Twitter users and generate a notification from Twitter to the recipient that their username has been included within a tweet.

38. Defendant Benton directed the mentions within the Twitter Statements to the Twitter Accounts of Viola's employer, Temple University, the Dean of Temple University's Klein College of Media and Communication, David Boardman, and two Temple University journalism professors, Aron Pilhofer and Brian Creech.

39. The Twitter Statements including the following:

    a. "I think that this attitude — permanently rejecting a news source because it accurately reports something you don't like — is exactly what you want in a journalism professor, yes? Also, spell our name right, Francesca Viola of Temple University."

8

b. "For what it's worth, Temple journalism professor Francesca Viola also believes Seth Rich was murdered by Hillary Clinton and the DNC";

c. "She also believes @DRUDGE_REPORT has sold out to the libs";

d. "She's also not a particular fan of Muslims, it seems";

e. "She seems to lack a basic understanding of the First Amendment and is upset that @PhillyInquirer doesn't 'give readers a chance to express any anti-Muslim or anti-immigrant sentiments' or comment on 'crimes involving African Americans"; and

f. "Oh, she also believes that Trump actually won the *real* popular vote, which was warped by 'some illegal votes cast in California"

g. Basically, Francesca Viola of @TempleUniv is pretty much exactly what you want in a journalism professor. Cc: @dlboardman @pilhofer @brcreech

40. In order to harm Viola's reputation, Defendant Benton selectively published statements from the Truthseeker account in a manner which created the false impression that she is a racist and islamophobic.

41. According to Merriam-Webster.com, this practice of publicly identify[ing] or publish[ing] private information about (someone) especially as a form of punishment or revenge" is defined as "doxxing."

42. Defendant Benton's efforts to dox Viola were a violation of the Harvard University Privacy Statement, the BRD and the BRDPS.

43. Defendant Benton's Twitter Statements were published to his thousands of Twitter followers and drew numerous comments, many of which were critical of his doxxing of Viola.

44. After receiving criticism for doxxing Viola from his Twitter followers, including other journalists, Defendant Benton published an apology on Twitter, attached hereto as **Exhibit H,** on May 9, 2018 stating that he "regret[ed his] error in judgment." Defendant Benton did not remove the Twitter Statements and they remain online and accessible to anyone.

45. Defendant Benton's doxxing of Viola also drew immediate media attention which generated numerous articles about Viola that appeared in print and online as well as broadcast news coverage.

46. Viola immediately became a social pariah at Temple and within her community. Several of her colleagues demanded that she be fired and published an editorial which was critical of Viola in the Temple University School newspaper.  Viola was also ostracized during faculty meetings and on campus.

47.  As a result of Defendant Benton's actions, Viola lost her job at Temple and suffered extreme humiliation, a loss of her hard-earned reputation, and severe emotional distress for which she has sought counseling.

## Count I: Invasion of Privacy-Publication of Private Facts

48. Viola realleges and reavers the Preceding Paragraphs as if fully rewritten and restated herein.

49. Pursuant to the BRDPS, the BRD, as well as the Privacy Statement maintained by Defendant Harvard on its own website, Viola had a reasonable expectation that her identity would remain anonymous while posting a comment to the Article using a pseudonymous Discus account.

50. Prior to Defendant Benton's doxxing of Viola, her association with the Truthseeker account had not been made public.

51. Defendant Benton intentionally abused his administrative access to the Plaintiff's email address to discover the private fact of her true identity in association with the Truthseeker account.

52. Defendant Benton proceeded to take this wrongly obtained personal information and publish the Twitter Statements online using his Twitter profile.

53. Defendant Benton did so to humiliate, harass, and cause harm to Plaintiff.

54. The subject of Plaintiff's posts was a matter of her own private opinion and was not a matter of public concern.

55. The posting of her private identity and information regarding her employment and employer were highly offensive to Plaintiff, because she reasonably expected her identity to remain private and her speech was anonymous.

56. Defendant Benton's actions have caused Plaintiff outrage, great mental anguish, humiliation and continue to harm her professional standing.

57. Defendant Benton undertook these actions during the course and scope of his employment with Defendant Harvard.

**Count II: Invasion of Privacy-Intrusion upon Seclusion**

58. Plaintiff realleges and reavers the preceding Paragraphs as if fully rewritten and restated herein.

59. On or about May 4, 2018, Defendant Benton intentionally, and without authorization, invaded the privacy of Plaintiff by abusing his administrative access on the website Disqus to gain access to Plaintiff's identity.

11

60. Defendant Benton, at the time of the intrusion, was acting within the course and scope of his employment with Defendant Harvard University.

61. After the intrusion, Defendant Benton intentionally published the information he accessed about Plaintiff to his Twitter account in the Twitter Statements to harass and otherwise embarrass Plaintiff.

62. This abuse of administrative access was offensive to Plaintiff as she had a reasonable expectation of privacy in posting her comments on Disqus.

63. The profile created by Viola, and the subsequent comments, were private matters and not of public concern.

64. This intrusion by Defendant Benton has caused great mental anguish, harm and damages for Viola.

### Count III: Invasion of Privacy-False Light

65. Viola realleges and reavers the preceding Paragraphs as if fully rewritten and restated herein.

66. Through publication of the Twitter Statements to his thousands of followers, Defendant Benton gave widespread publicity to matters concerning Viola that unreasonably place Viola in a false light before the public.

67. Defendant Benton selectively published the Twitter Statements in a manner to give the false impression that Viola is a racist and islamophobic.

68. The false light in which Viola has been placed would be highly offensive to a reasonable person and continues to be highly offensive to Viola because she is not a racist or islamophobic.

69. Defendant Benton knew that the Twitter Statements placed Viola in a false light or acted with reckless disregard as to the false impression which they created.

70. As a result of the false light in which she has been placed, Viola has suffered great mental anguish, harm and damages with the exact amount to be proven at trial.

## Count IV: Defamation by Implication

71. Viola realleges and reavers the preceding Paragraphs as if fully rewritten and restated herein.

72. The Twitter Statements constitute defamation by implication as they are intentionally misleading concerning the character and beliefs of Viola and selectively published for the purpose of destroying Viola's reputation and standing in the community by inferring that she is a racist and islamophobic.

73. In furtherance of his efforts, Defendant Benton not only published the Twitter Statements to his thousands of followers, he maliciously included Twitter mentions to the Twitter accounts of her employer, her school dean, and her colleagues, in order to deter them from associating with her.

74. The Twitter Statements constitute libel per se as they are false, defamatory and impugn Viola in her trade and profession.

75. Defendant Benton authored and published the Twitter Statements on the Internet without privilege or authorization.

76. The Twitter Statements were read by visitors of the Internet throughout the State of Pennsylvania and the United States, including but not limited to Viola's employer, her colleagues, her students, and other members of her community.

13

77. Viola is informed and believes and, upon that basis, assert that the Twitter Statements were written and published with malice in that those publications were made with knowledge of the false impression they would create, or with reckless disregard as to the same.

78. As a direct and proximate result of Defendant Benton's actions, Viola has suffered significant reputational harm and sustained actual damages including, but not limited to, mental anguish, loss of income, lost productivity, expenses incurred, and loss of intangible assets in an amount to be proven at trial.

## Count V: Breach of Contract

79. Viola realleges and reavers the preceding Paragraphs as if fully rewritten and restated herein.

80. On May 4, 2018, and at all times material herein, the website niemanlab.org was governed by the Privacy Statement maintained by Defendant Harvard on its main website. The Privacy Statement assures users that while data may be collected by the website and potential third parties, the user's identity will remain anonymous.

81. The Privacy Statement also assures users that the data collected will not be shared without the user's permission.

82. Nieman Lab utilized the third party Disqus to administer and monitor the comments section on niemanlab.org and was bound by the BRDPS which prohibit the distribution of personal identifiable information and the intimidation of users of Disqus services.

83. Users of Disqus agree to the BRD prior to posting any comments and pursuant to the BRD, the distribution of personal identifiable information and targeted harassment is prohibited.

14

84. Viola reasonably relied upon the assurances of the Harvard Privacy Policy and the Disqus Policies when accessing and commenting on the website.

85. Defendant Benton breached the contracts created by both the Harvard Privacy Policy and the Disqus policies by abusing his access as administrator to invade Viola's privacy and violate her right to anonymity by publishing her identity and identifying information about her employer and colleagues on his Twitter account.

86. At all times Defendant Benton was acting within the course and scope of his employment with Defendant Harvard.

87. As a result of Defendant Benton's breach of these contracts, Viola has suffered damages in an amount to be proven at trial.

### Count VI: Promissory Estoppel

88. Viola realleges and reavers the preceding paragraphs as if fully rewritten and restated herein.

89. By posting the promise that a user's identity will be kept anonymous while users are accessing their website, Defendant Harvard created in users a reasonable reliance of anonymity to promote the use of its website.

90. Viola relied, to her detriment, upon that promise of anonymity and accessed the website and comments section under a pseudonym.

91.  Viola's reliance was reasonable and foreseeable.

92. Defendant Benton intentionally breached this promise by posting Viola's personal information in the Twitter Statements.

93. Defendant Benton was acting within the course and scope of his employment with Defendant Harvard at the time he breached this promise.

94. As a direct and proximate result of this broken promise, Viola has suffered damages in an amount to be proven at trial.

## Count VII: Intentional Infliction of Emotional Distress

95. Viola realleges and reavers the preceding paragraphs as if fully rewritten and restated herein.

96. Defendant Benton maliciously published the Twitter Statements to his thousands of Twitter followers for the purpose of intimidating and harassing Viola, disrupting her relationship with her employer, and destroying her reputation and standing in the community because he disagreed with viewpoints she expressed anonymously online.

97. Defendant Benton's actions were undertaken with the intent to cause, or in disregard of a substantial probability of causing severe emotional distress to Viola.

98. It is highly foreseeable that a causal connection would exist between the deliberate and malicious targeted harassment that Defendant directed toward Viola and the resulting injury to Viola of severe emotional distress.

99. As a direct and proximate result of Defendant Benton's intentional infliction of emotional distress, Viola has suffered physical and mental harm and other damages with the exact amount to be proven at trial.

## Count VIII: Tortious Interference with Contractual Relations

100. Viola realleges and reavers the preceding paragraphs as if fully rewritten and restated herein.

101. Viola had an existing contractual relationship with her employer, Temple University and had a reasonable expectation of a future professional relationship with

16

Temple based on her excellent job performance and previous renewals of her teaching contract.

102.    Defendant Benton was aware of Viola's existing professional relationship with Temple University.

103.    Defendant Benton intentionally and improperly interfered with Viola's existing relationship with her employer by unlawfully authoring and publishing the Twitter Statements without justification.

104.    As a direct and proximate result of Defendant Benton's unlawful interference, Viola lost her teaching position with Temple University and has suffered damages in an amount to be proven at trial.

WHEREFORE, Plaintiff Francesca Viola, demands judgment against Defendants, as follows:

(a)    Permanent deletion of the Twitter Statements which name or make reference to Viola.

(b)    A statement posted to Defendant Benton's Twitter account and the Nieman Lab website admitting the breach of the websites' user agreements and a public apology to Viola.

(c)    Actual and/or compensatory damages, and punitive damages where available, in an amount exceeding $150,000.00 with the exact about to be proven at trial;

(d)    Costs of this action, reasonable attorney fees, and pre- and post-litigation interest at the maximum rate provided by law;

(e)    For any and all other relief to which the Court determines Plaintiff is entitled.

Respectfully submitted,

**BOCHETTO & LENTZ, P.C.**

David P. Heim, Esquire
1524 Locus Street
Philadelphia, PA 19102
Telephone: (215) 735-3900
Facsimile: (215) 735-2455
E-Mail: dheim@bochettoandlentz.com

Attorney for Plaintiff, Francesca Viola

MINC LLC
Aaron M. Minc (0086718)*
Dorrian H. Horsey (0081881)*
200 Park Ave., Suite 200
Orange Village, OH 44122
Telephone: (216) 373-7706
Facsimile: (440) 792-5327
E-Mail: aminc@minclaw.com
        dhorsey@minclaw.com

Attorneys for Plaintiff Francesca Viola
*Pro hac vice* admission pending

18