UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FRANCESCA VIOLA,        ) | |
|          ) | |
|     Plaintiff,     ) | |
|          ) | |
| v.           ) | Civil No. 21-10426-LTS |
|          ) | |
| JOSHUA BENTON and    ) | |
| PRESIDENT AND FELLOWS OF  ) | |
| HARVARD COLLEGE,    ) | |
|          ) | |
|     Defendants.    ) | |

ORDER ON DEFENDANTS' MOTION TO DISMISS (DOC. NO. 12)

June 28, 2021

SOROKIN, J.

      Plaintiff Francesca Viola sued Defendants Joshua Benton and President and Fellows of

Harvard College ("Harvard") (collectively, "Defendants") alleging contract and tort claims

arising from a set of statements Benton made about Viola on Twitter. Before the Court is

Defendants' Motion to Dismiss for Failure to State a Claim (Doc. No. 12).[1] For the reasons that

follow, Defendants' Motion to Dismiss is ALLOWED IN PART and DENIED IN PART.

## I.   FACTS

### A. Viola's "Truthseeker" Account

      The Court sets forth the facts below from Plaintiff's Amended Complaint (Doc. No. 10)

and the exhibits attached to the Amended Complaint, drawing all reasonable inferences in

Plaintiff's favor. Beginning in 2004, Viola worked as a journalism professor in the Klein College

---

[1] Citations to "Doc. No. __" reference documents appearing on the Court's electronic docketing
system; pincites are to the page numbers in the ECF header.

of Media and Communication at Temple University ("Temple"). Id. ¶ 7. She worked under a teaching contract that was "renewed periodically throughout her employment without issue." Id. ¶ 9. At some point prior to May 2017, Viola created a profile on Disqus, "an application used by thousands of websites which provides a platform for users to post comments on a website's blog articles by creating an account using a [display] name . . . and email address." Id. ¶¶ 18, 27. Disqus permits users to choose a display name that is visible to the public whenever they post a comment through the platform. Id. ¶ 19. Viola chose the pseudonymous display name "truthseeker." Id. ¶ 27.

Around May 2017, Viola posted the following comments on website blog articles under the display name truthseeker:[2]

> **truthseeker:** Really, you hater? I'm a college professor and an attorney; I'm not overweight and I don't drink. I watch Hannity and he is absolutely right about this Seth Rich thing. You are obviously a bitter democrat who doesn't want to face up to the fact that the DNC is corrupt, and like Hillary will do anything to preserve power… even murder.

> **truthseeker:** Wrong. Seth Rich leaked the DNC plot to sabotage Bernie to Wikileaks. The DNC had him killed. This Russia story was manufactured as a distraction. You stupid libs keep pushing the Russian narrative with not one shred of evidence. And don't tell me "19 intelligence agencies say so." But notice they never offer solid factual evidence. But if there's any justice, the truth will come out. Just like we learned eventually that the democrat talking points about the Benghazi murders being caused by an anti-Muslim video were a lie, the democrat attempt to deflect from their corruption and murder saying "the Russians did it" will be proven tone yet another lie. Keep it up Dems. You'll just keep losing elections till you cease to exist as a party. I can hardly wait.

---

[2] The truthseeker comments throughout this Order are drawn from Doc. No. 10-11, an exhibit to Plaintiff's Amended Complaint. In some cases where the truthseeker comments attached to the Amended Complaint were not fully legible, the Court looked to copies of the truthseeker comments attached to Defendants' Motion to Dismiss at Doc. No. 12-3. Plaintiff has never suggested that the comments attached to Defendants' Motion vary from what was attached to her Amended Complaint. The truthseeker comments are presented in the form in which they appear in these attachments with no alterations made by the Court.

Doc. No. 10-11 at 1.

Around the same time, Viola posted the following comment under the display name truthseeker on a Breitbart News website article headlined "Deep State Leaks Highly Classified Info to Washington Post to Smear President Trump":

> **truthseeker:** I'm not reading Drudge anymore. Ever since Trump got elected he links to the lib mainstream media way to much. Starting to think there's been a management change.

Id.

Finally, also around May 2017, the following comment was posted under the display name truthseeker on a Gateway Pundit website article that referenced Muslims praying in front of Trump Tower in New York for Ramadan:

> **truthseeker:** Scum. Deport them. They hate us. Get rid of them.

Id. at 2. Viola specifically denies posting this comment (the "Muslim Comment"). Doc. No. 10 ¶ 53. She alleges that on the Disqus platform, "[m]ultiple users may choose to use the same Display Name which may be pseudonymous." Id. ¶ 19.[3]

Around September 2017, Viola posted the following comments on a Philadelphia Inquirer article using the pseudonym truthseeker:

> **truthseeker:** You are stereotyping Trump voters, as many libs do. I am a college professor with a law degree, and I voted for Trump, because I don't need to be told what to think by all you sanctimonious left wingers, including Obama and Shrillary.

---

[3] Harvard takes issue with these allegations, Doc. No. 12-1 at 16, by stating that (1) in Viola's pre-suit demand letter, sent by her attorneys, she referred to the comments at issue in this case as "posted to other websites through the Disqus platform by the same 'truthseeker' account," Doc. No. 12-4 at 4; (2) in her original Complaint, Viola alleged that "Benton was also able to identify previous comments posted using the same Truthseeker Account" on other Disqus sites, Doc. No. 1 ¶ 31; and (3) neither of these documents specifically contended that Viola did not post the Muslim Comment. Under the applicable Motion to Dismiss standard, the Court accepts as true all factual allegations set forth in the Amended Complaint. Thus, at this stage, the Court does not consider these other points.

> **truthseeker:** I am a journalism professor and Ill tell you why I wont subscribe. Your coverage is virulently pro-leftist, and you try to control speech, which is antithetical to the First Amendment you claim to respect. How? I've been tracking your pattern of not allowing comments on any stories that involve race, crimes that involve African Americans, or any article that would give readers a chance to express any anti-Muslim or anti-immigrant sentiments. Although you and your editorial team may find these opinions uncomfortable and even repulsive, the First Amendment protects those opinions, and you as the standard bearers for the fourth estate have an obligation to let folks express themselves. You are failing members of the public whom you don't agree with, and that is why you will never expand your readership.

Doc. No. 10-11 at 2–3.

Finally, around January 2018, Viola posted the following comment under the pseudonym truthseeker referencing President Trump's election and voter fraud:

> **truthseeker:** You have no idea what my religion is and the reason Trump won is because more people voted for him than your girl. And save your tired breath on the tired refrain that Hillary won the popular vote because of some illegal votes cast in California. Yawn. So thank God people with common sense outnumber people like you.

Id. at 3.

### B. Viola's Comment on a Nieman Lab Article

The Nieman Journalism Lab ("Nieman Lab") is owned by the Nieman Foundation for Journalism at Harvard University. Doc. No. 10 ¶ 2. Defendant Joshua Benton, a journalist, is the founder and director of the Nieman Lab and an employee of Harvard University. Id. The Nieman Lab operates a website, located at www.niemanlab.org. Id. In May 2018, the Nieman Lab used Disqus to allow readers to post comments to articles published on its website. Id. ¶ 17.

On May 4, 2018, the Nieman Lab posted an article titled "People Who Are Delusional, Dogmatic, or Religious Fundamentalists Are More Likely to Believe Fake News." Id. ¶ 35. Viola posted an anonymous comment to this article using the display name truthseeker in response to another comment criticizing the article. Viola's comment in response to the comment of a critic of the article read:

> **truthseeker:** I am a journalism professor at a major east coast university and I completely agree with you. I follow Nieman but this is an article designed to insinuate that 1) Trump supporters who happen to be religious are delusional 2) conservative media that don't tout the democrat party talking points are disseminating 'fake news.' I will no longer use Neiman as a source.

Id. ¶ 37; Doc. No. 10-10. Benton read Viola's comment. Doc. No. 10 ¶ 39. As director of the Nieman Lab, "Benton had administrative access to view Viola's email address associated with [her] comment," and he used his administrative access to identify Viola as "truthseeker." Id. ¶¶ 38–40. Benton located all of the above quoted comments made under the display name truthseeker. Id. ¶¶ 41, 68–69.

### C.  Benton's Tweets About Viola

Later that day, Benton posted a series of tweets about comments by truthseeker, accompanied by screenshots of the comments. Id. ¶ 44; Doc. No. 10-11. These tweets were posted from his personal Twitter account (@jbenton), which included a bio stating, "I run @niemanlab at Harvard." Id.; Doc. No. 10 ¶¶ 13, 15. Benton's first tweet, which included a link to the Nieman Lab article and a screenshot of Viola's truthseeker comment, stated:

> **@jbenton:** I think that this attitude — permanently rejecting a news source because it accurately reports something you don't like — is exactly what you want in a journalism professor, yes? Also, spell our name right, Francesca Viola of Temple University.

Doc. No. 10-11 at 1. Benton followed this tweet with five additional tweets displaying and commenting on screenshots of truthseeker comments that were originally posted on articles in other publications. Benton's subsequent tweets, juxtaposed with the truthseeker comment that each tweet highlighted, are presented in Table 1 below:

**Table 1**

| Benton Tweet | Truthseeker Comment |
|---|---|
| **@jbenton:** For what it's worth, Temple Journalism professor Francesca Viola also believes Seth Rich was murdered by Hillary Clinton and the DNC | **truthseeker:** Really, you hater? I'm a college professor and an attorney; I'm not overweight and I don't drink. I watch Hannity and he is absolutely right about this Seth Rich thing. You are obviously a bitter democrat who doesn't want to face up to the fact that the DNC is corrupt, and like Hillary will do anything to preserve power… even murder.<br><br>**truthseeker:** Wrong. Seth Rich leaked the DNC plot to sabotage Bernie to Wikileaks. The DNC had him killed. This Russia story was manufactured as a distraction. You stupid libs keep pushing the Russian narrative with not one shred of evidence. And don't tell me "19 intelligence agencies say so." But notice they never offer solid factual evidence. But if there's any justice, the truth will come out. Just like we learned eventually that the democrat talking points about the Benghazi murders being caused by an anti-Muslim video were a lie, the democrat attempt to deflect from their corruption and murder saying "the Russians did it" will be proven tone yet another lie. Keep it up Dems. You'll just keep losing elections till you cease to exist as a party. I can hardly wait. |
| **@jbenton:** She also believes @DRUDGE_REPORT has sold out to the libs | **truthseeker:** I'm not reading Drudge anymore. Ever since Trump got elected he links to the lib mainstream media way to much. Starting to think there's a management change. |
| **@jbenton:** She's also not a particular fan of Muslims, it seems | **truthseeker:** Scum. Deport them. They hate us. Get rid of them. |
| **@jbenton:** She seems to lack a basic understanding of the First Amendment and is upset that @PhillyInquirer doesn't "give readers a chance to express any anti-Muslim or antiimmigrant sentiments" or comment on "crimes involving African Americans" | **truthseeker:** You are stereotyping Trump voters, as many libs do. I am a college professor with a law degree, and I voted for Trump, because I don't need to be told what to think by all you sanctimonious left wingers, including Obama and Shrillary. |

| | **truthseeker:** I am a journalism professor and Ill tell you why I wont subscribe. Your coverage is virulently pro-leftist, and you try to control speech, which is antithetical to the First Amendment you claim to respect. How? I've been tracking your pattern of not allowing comments on any stories that involve race, crimes that involve African Americans, or any article that would give readers a chance to express any anti-Muslim or anti-immigrant sentiments. Although you and your editorial team may find these opinions uncomfortable and even repulsive, the First Amendment protects those opinions, and you as the standard bearers for the fourth estate have an obligation to let folks express themselves. You are failing members of the public whom you don't agree with, and that is why you will never expand your readership. |
|---|---|
| **@jbenton:** Oh, she also believes that Trump actually won the *real* popular vote, which was warped by "some illegal votes cast in California" | **truthseeker:** You have no idea what my religion is and the reason Trump won is because more people voted for him than your girl. And save your tired breath on the tired refrain that Hillary won the popular vote because of some illegal votes cast in California. Yawn. So thank God people with common sense outnumber people like you. |

Id. at 1–3. Benton concluded with a final tweet:

> **@jbenton:** Basically, Francesca Viola of @TempleUniv is pretty much exactly what you want in a journalism professor. cc: @dlboardman @pilhofer @brcreech.

Id. at 3. This last tweet was directed at the Twitter account of Viola's employer, Temple University (@TempleUniv), the Dean of Temple University's Klein College of Media and Communication, David Boardman (@dlboardman), and two Temple University journalism professors, Aron Pilhofer (@pilhofer) and Brian Creech (@brcreech). Doc. No. 10 ¶ 49.

On May 9, 2018, Benton tweeted the following apology:

> **@jbenton:** In a series of tweets on Friday, May 4, I wrote about an anonymous commenter to a Nieman Lab story. I identified her and her place of work and shared comments posted from the same account on other websites. By revealing such details without making an effort to contact her and seek confirmation and explanation, and otherwise adhere to rigorous reporting methods, the tweets did not meet Nieman's journalistic standards. I apologize and regret my error in judgment.

Doc. No. 10-12. Viola alleges that this apology was jointly crafted by Benton and his employer, Harvard, but he faced no other disciplinary action from Harvard. Doc. No. 10 ¶¶ 58–59. She also alleges that Benton "did not remove or retract the Twitter Statements and they remain online and accessible to anyone." Id. ¶ 61.

### D. Aftermath

Benton's tweets drew "immediate media attention which generated numerous articles about Viola that appeared in print and online as well as broadcast news coverage." Id. ¶ 62. Because of the tweets, Viola "immediately became a social pariah at Temple and within her community," and her colleagues demanded her firing and published an editorial criticizing her in the Temple University school newspaper. Id. ¶ 63. She also received dozens of harassing emails and phone calls, which caused humiliation and emotional distress. Id. ¶¶ 64–65. Ultimately, Viola lost her job at Temple. Id. ¶ 65. She subsequently sued Harvard and Benton. Id. at 1.

## II.  PROCEDURAL HISTORY

Plaintiff initially filed this case in the Eastern District of Pennsylvania on March 16, 2020. Doc. No. 1. Defendants moved to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction over Harvard and Rule 12(b)(6) for failure to state a claim upon which relief may be granted.[4] Doc. No. 12. Plaintiff opposed, Doc. No. 15; Defendants replied, Doc. No. 22; and Plaintiff filed a surreply, Doc. No. 25. The court determined that it lacked personal jurisdiction

---

[4] The motion was filed by Harvard and subsequently joined by Benton. See Doc. Nos. 26, 28.

over Harvard and transferred the case to the District of Massachusetts on March 11, 2021

pursuant to 28 U.S.C. § 1631. Doc. Nos. 29, 30.

Once the case was transferred, this Court, after seeking and reviewing a status report

from the parties on the pending motion, determined that it would resolve the Rule 12(b)(6)

portion of Defendants' Motion to Dismiss based on the briefs previously filed in the Eastern

District of Pennsylvania.[5] Doc. No. 43. The Court held a hearing on June 22, 2021 and resolves

the motion below.

## III. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft

v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570

(2007)). The complaint must also "set forth 'factual allegations, either direct or inferential,

respecting each material element necessary to sustain recovery under some actionable legal

theory.'" Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997) (quoting Gooley v. Mobil Oil

Corp., 851 F.2d 513, 515 (1st Cir. 1988)). "Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Courts

must "take all factual allegations [in the complaint] as true and . . . draw all reasonable inferences

in favor of the plaintiff." Rodríguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 96 (1st Cir. 2007).

---

[5] Both parties' briefs apply Pennsylvania law. In their Motion to Dismiss, Defendants noted that "[b]ecause there is no material difference between Pennsylvania and Massachusetts law on the issues addressed in this motion, the Court need not engage in a choice of law analysis." Doc. No. 12-1 at 13 n.2. While the parties disagreed about whether further briefing was required on the Rule 12(b)(6) motion post-transfer, no party raised choice of law as an issue. The Court takes this as agreement that Pennsylvania law still applies as to the pending motion and proceeds accordingly.

## IV. DISCUSSION

### A. Harvard's Vicarious Liability for Benton's Actions

As a preliminary matter, Viola has plausibly alleged that Harvard is vicariously liable for Benton's actions. The actions of an employee give rise to vicarious liability of the employer if those acts are committed within the "scope of employment." Butler v. Flo-Ron Vending Co., 557 A.2d 730, 736 (Pa. Super. 1989). Conduct is within the scope of employment if:

> (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master, and (d) if force is intentionally used by the servant against another, the use of the force is not unexpectable by the master.

Id. (quoting Restatement (Second) of Agency § 228). No party disputes that Benton runs the Nieman Lab and that Benton is an employee of Harvard because the Nieman Lab is part of Harvard. Harvard argues that Benton was not furthering any business purpose of Harvard when he obtained Viola's identity and posted the tweets. Doc. No. 12-1 at 28. However, Viola alleges that Benton is employed as a journalist, and that he used his Twitter account

> as a part of his job responsibilities to further Harvard's interest of increasing awareness of his role at Nieman Lab, to promote the Nieman Lab brand through discussion of Nieman Lab stories and other news events, and to interact with other journalists and readers on behalf of Nieman Lab as its director and founder.

Doc. No. 10 ¶ 16. She alleges that Benton was acting as a journalist when he viewed her email address and published the tweets about the truthseeker comments. Id. ¶¶ 38–41. Drawing reasonable inferences in Viola's favor at this stage, Benton was plausibly acting within the scope of his employment as a journalist and Director of the Nieman Lab when he obtained Viola's email address and published the tweets at issue, and Harvard is vicariously liable for his actions. The Court thus denies Harvard's request for dismissal on this basis and turns to Viola's contract and tort claims.

### B.  Invasion of Privacy

In Pennsylvania, "[a]n action for invasion of privacy is comprised of four distinct torts: (1) intrusion upon seclusion, (2) appropriation of name or likeness, (3) publicity given to private life and (4) publicity placing the person in a false light." Harris v. Easton Pub. Co., 483 A.2d 1377, 1383 (Pa. Super. 1984); Vogel v. W. T. Grant Co., 327 A.2d 133, 136 n.9 (Pa. 1974) (defining invasion of privacy torts as laid out by Sections 652B through 652E of the Restatement (Second) of Torts). Viola alleges intrusion upon seclusion, publication of private facts, and false light claims based on Benton's use of his moderation abilities to retrieve Viola's email address from the comment she posted to the Nieman Lab article and his subsequent publication of the truthseeker comments on Twitter.

### 1.  Intrusion upon Seclusion (Count II)

Pennsylvania courts rely on Section 652B of the Restatement (Second) of Torts for the definition of intrusion upon seclusion:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

See, e.g., Harris, 483 A.2d at 1383. A plaintiff must allege that a defendant invaded his or her privacy "(1) by physical intrusion into a place where the Plaintiff has secluded himself, (2) by use of the defendant's senses to oversee or overhear the Plaintiff's private affairs, or (3) some other form of investigation or examination into Plaintiff's private concerns." Id. (citing Restatement (Second) of Torts § 652B, cmt. b). A defendant is subject to liability "only when he has intruded into a private place, or has otherwise invaded a private seclusion that the Plaintiff has thrown about his person or affairs." Gabriel v. Giant Eagle, Inc., 124 F. Supp. 3d 550, 572 (W.D. Pa. 2015) (citing Restatement (Second) of Torts § 652B, cmt. c). "An action pursuant to

11

this section does not depend upon any publicity given to the person whose interest is invaded or to his affairs." Harris, 483 A.2d at 1383 (citing Restatement (Second) of Torts § 652B, cmt. a).

Viola does not state a claim for intrusion upon seclusion because she does not sufficiently put forth that the alleged intrusion—Benton viewing her email address, which was associated with the truthseeker comment she posted on the Nieman Lab website—was itself wrongful or caused her harm. Under Pennsylvania law, "'intrusion upon seclusion' is not implicated where . . . the defendant [has] legitimately obtained the information," Burger v. Blair Med. Assocs., Inc. 964 A.2d 374, 378 (Pa. 2009). Rather, her claim centers on the allegedly wrongful act that Benton committed after he acquired her email address, which was publishing the information on Twitter. However, publication is not relevant to the intrusion upon seclusion analysis. See Harris, 483 A.2d at 1383.

Drawing reasonable inferences in Viola's favor, Benton did not access Viola's email address illegitimately. The Amended Complaint states that Benton "[i]n his capacity as Director of Nieman Lab . . . had administrative access to view Viola's email address associated with [her] comment posted to the [Nieman Lab] Article." Doc. No. 10 ¶ 38. Viola also notes that "email addresses of users who comment on websites using Disqus [are] accessible by the website administrators [or moderators]" but not by the public. Id. ¶ 21. Benton thus had access to Viola's email address because he was an administrator and moderator of the Neiman Lab website. The action of a moderator (here Benton, per the Amended Complaint) to look at the email address behind an anonymous comment is an aspect of moderating a website. The Pennsylvania caselaw put forth by both parties establishes that the act of accessing or obtaining private information must lack a legitimate purpose for this claim to stand. See Burger, 964 A.2d at 379 (denying intrusion upon seclusion claim where health care provider "legitimately obtained this

information as part of [the plaintiff's] treatment"); <u>McGuire v. Shubert</u>, 722 A.2d 1087, 1089 (Pa. Super. 1998) (allowing intrusion upon seclusion claim where bank employee accessed confidential financial information, which was not a legitimate aspect of her work as a bank telephone sales representative). Viola does not state a claim for intrusion upon seclusion because she has failed to plausibly allege that Benton's alleged intrusion (examining the email address) was illegitimate.

Viola also argues in her papers that she states a claim based on a harassment theory of intrusion upon seclusion, but this argument fails as well. Courts have noted that "[c]onduct that amounts to a persistent course of hounding, harassment and unreasonable surveillance" may "rise to the level of invasion of privacy based on intrusion upon seclusion." <u>Wolfson v. Lewis</u>, 924 F. Supp. 1413, 1420 (E.D. Pa. 1996); <u>see also</u> <u>Diaz v. D.L. Recovery Corp.</u>, 486 F. Supp. 2d 474, 479–80 (E.D. Pa. 2007). Viola argues for the application of this theory based on the claim that Benton "repeatedly targeted and harassed Viola in a string of tweets published to thousands of Twitter followers which completely disrupted her personal and professional life and caused her great distress." Doc. No. 15 at 22. However, this argument again confuses intrusion with publication—even if Benton's seven tweets could be considered "repeated" harassment, they are not intrusions upon Viola's seclusion, but rather, publication of information that Benton had previously acquired. Defendants' Motion to Dismiss is ALLOWED as to Count II of the Amended Complaint.

### 2. Publication of Private Facts (Count I)

The elements of a publication of private facts claim are: (1) giving publicity; (2) to private facts; (3) of a kind highly offensive to a reasonable person; and (4) which are not of legitimate concern to the public. <u>Bowley v. City of Uniontown Police Dep't</u>, 404 F.3d 783, 788

n.7 (3d Cir. 2005) (citing <u>Jenkins v. Bolla</u>, 600 A.2d 1293, 1296 (Pa. Super. 1992)).

Pennsylvania courts have adopted the tort as set forth in the Restatement (Second) of Torts §

652D. <u>See</u> <u>Jenkins</u>, 600 A.2d at 1295, 1296 n.1.

      The Court notes that an official note to Section 652D of the Restatement describes this

tort as applicable only to true statements. Restatement (Second) of Torts § 652D, Special Note

on Relation of § 652D to the First Amendment to the Constitution ("This Section provides for

tort liability involving a judgment for damages for publicity given to true statements of fact.");

<u>cf.</u> <u>Vurimindi v. Fuqua Sch. of Bus.</u>, 435 F. App'x 129, 135 (3d Cir. 2011) (describing this tort

as "publication of true but 'private' facts"). Viola expressly denies making the Muslim

Comment—in other words, she does not allege that it is a true but private statement of fact.

Consequently, she cannot bring this claim based on Benton's publication of the Muslim

Comment. To the extent her claim for publication of private facts is based on Benton's

publication of the Muslim Comment, it fails.

      As to Benton's publication of the other truthseeker comments, Viola does not sufficiently

allege that these comments (which she does not deny making) are not of legitimate concern to

the public. The Supreme Court has explained that speech deals with matters of public concern

when it can "be fairly considered as relating to any matter of political, social, or other concern to

the community" or when it is "a subject of legitimate news interest; that is, a subject of general

interest and of value and concern to the public." <u>Snyder v. Phelps</u>, 562 U.S. 443, 453 (2011)

(citations omitted). The truthseeker comments Viola authored discuss current political and social

matters including the accuracy of the position taken by a national television commentator about a

widely discussed death in Washington, assert a major political party orchestrated a murder,

describe the "source" of a major media story, criticize a major news source for an actual or

perceived change in the types of articles cited by its website, discuss the accuracy of widely reported vote totals for the 2016 presidential election, describe the First Amendment obligations or responsibilities borne by newspapers, and invoke Viola's role as a college or journalism professor in several instances. Statements of these types (about the journalism profession, the conduct of the media, and the truthfulness or accuracy of stories under general public discussion) by a journalism professor at a publicly funded university are matters of legitimate public interest and go to the very heart of Viola's publicly funded job.[6] Moreover, Viola made these comments publicly—each comment was available for any person with internet access anywhere in the world to read.[7] Defendants' Motion to Dismiss is ALLOWED as to Count I of the Amended Complaint.

### 3. False Light (Count III)

"Pennsylvania has adopted the definition of false light invasion of privacy from the Restatement (Second) of Torts, which imposes liability on a person who publishes material that 'is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity.'" Graboff v. Colleran Firm, 744 F.3d 128, 136 (3d Cir. 2014)

---

[6] Viola's reliance on McCabe v. Vill, Voice, Inc. 550 F. Supp. 525, 530 (E.D. Pa. 1982), Doc. No. 15 at 23, is inapposite. McCabe involved the publication of a photograph of a nude woman in a bathtub, which the court held was not newsworthy or a matter of public concern; this scenario is not at all comparable to Viola's truthseeker comments, which discuss journalism and media coverage, both of which are matters highly relevant to her job as a journalism professor.

[7] Whether or not the Pennsylvania legislature ought to create an absolute right to remain anonymous online is a matter for other branches of government. Plaintiff has cited no such law here. In addition, whether a government may prohibit forms of anonymous speech, for example by requiring permits for certain speech, see Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton, 536 U.S. 150, 167 (2002), or require the disclosure of the identities of anonymous commenters, see Pilchesky v. Gatelli, 12 A.3d 430, 438 (Pa. Super. 2011), present wholly different legal issues than whether Viola's "anonymous" truthseeker comments were matters of public concern such that Benton's comments do not give rise to the tort of publication of private facts.

(quoting Larsen v. Phila. Newspapers, Inc., 543 A.2d 1181, 1188 (Pa. Super. 1988)); see also

Restatement (Second) of Torts § 652E. "[F]alse light invasion of privacy offers redress not

merely for the publication of matters that are provably false, but also for those that, although

true, are selectively publicized in a manner creating a false impression." Krajewski v. Gusoff, 53

A.3d 793, 806 (Pa. Super. 2012). "[T]he false-light tort requires actual malice." McCafferty v.

Newsweek Media Grp., Ltd., 955 F.3d 352, 360 (3d Cir. 2020). "'Actual malice' is a term of art

that does not connote ill will or improper motivation. Rather, it requires that the publisher either

know that its article was false or publish it with 'reckless disregard' for its truth." Id. (citing Am.

Future Sys., Inc. v. Better Bus. Bureau of E. Pa., 923 A.2d 389, 399 n.12 (Pa. 2007)); see also

New York Times Co. v. Sullivan, 376 U. S. 254, 280 (1964).

Viola does not sufficiently allege that Benton acted with actual malice in posting the

truthseeker comments. She claims that Benton "selectively published the Twitter Statements

including the Muslim Comment in a manner to give the false impression that Viola is racist,

Islamophobic and not competent to perform her job," Doc. No. 10 ¶ 91, and that Benton either

knew his tweets would place her in a false light or acted with reckless disregard as to the false

impression they would create, id. ¶ 93. Even drawing inferences in Viola's favor, these are "mere

conclusory statements" that cannot support this cause of action. First, Viola does not put forth

how Benton "selectively published" the truthseeker comments she admits to authoring—based

on her own allegations, he published the comments in their entirety, with minimal commentary

of his own. His accompanying tweets at best summarize the content of her truthseeker

comments. They cannot be said to place her in a false light.

Second, Viola does not allege that Benton acted either knowingly or with reckless

disregard as to the publication of the Muslim Comment, which she denies making. The Amended

Complaint lays out that Benton (1) used his moderation abilities to discover the email address behind the comment Viola left on the Nieman Lab website, id. ¶ 39; (2) with this information, identified "previous anonymous comments posted using the same Truthseeker Account on other Disqus powered websites," id. ¶ 41; and (3) did not contact Viola to confirm she was the author of the truthseeker comments before he tweeted, id. ¶ 43. For Benton to have published with reckless disregard, he must have "entertained serious doubts as to the truth of his publication," St. Amant v. Thompson, 390 U.S. 727, 731 (1968), or acted with a "high degree of awareness of . . . probable falsity," Garrison v. Louisiana, 379 U.S. 64, 74 (1964). The Amended Complaint fails to allege facts plausibly giving rise to the conclusion that Benton acted recklessly. That Viola admits she authored five of the six truthseeker comments Benton published further undermines any conceivable inference that his pre-publication process was reckless. Nor does Viola allege that Benton ought to have been able to differentiate between the Muslim Comment and the truthseeker comments she authored such that he was reckless in connecting them, nor any reason he would have either known that the Muslim Comment was false or had "serious doubts" about its veracity.

Viola emphasizes repeatedly that Benton violated journalistic norms when he did not contact her to verify that she posted the truthseeker comments, Doc. No. 10 ¶¶ 43, 90; Doc. No. 15 at 25, 29–30, but mere negligence or deviation from professional standards is insufficient to allege actual malice. See Tucker v. Phila. Daily News, 848 A.2d 113, 135 (Pa. 2004) (the "failure to check sources, or negligence alone, is simply insufficient" to prove actual malice); Sprague v. Walter, 543 A.2d 1078, 1084 (Pa. 1988) (actual malice "requires more than a consideration of whether a reasonably prudent man would have published the article without further investigation, but rather requires the presentation of 'sufficient evidence to permit the

17

conclusion that the defendant in fact <u>entertained serious doubts</u> as to the truth of his publication'") (citation omitted).

Finally, the Court notes that Viola's argument that Benton acted out of "ill will toward the 'right leaning political views'" expressed by the truthseeker comments and his desire to see her "harassed publicly," Doc. No. 15 at 30, also does not establish that he acted with actual malice for purposes of this claim. The Supreme Court has noted that actual malice in this context "should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will." <u>Masson v. New Yorker Magazine, Inc.</u>, 501 US 496, 510 (1991) (citation omitted). The issue of whether Benton's actions were motivated by animus towards Viola is irrelevant to this analysis. Viola does not state a claim for false light. Defendants' Motion to Dismiss is ALLOWED as to Count III of the Amended Complaint.

### C.  Libel (Count IV) and Defamation by Implication (Count V)

Pennsylvania tort law defines libel as "a maliciously written or printed publication which tends to blacken a person's reputation or expose him to public hatred, contempt or ridicule, or injure him in his business or profession." <u>Brophy v. Phila. Newspapers Inc.</u>, 422 A.2d 625, 628 (Pa. Super. 1980). "In order to be actionable, the words must be untrue, unjustifiable, and injurious to the reputation of another." <u>Joseph v. Scranton Times L.P.</u>, 959 A.2d 322, 334 (Pa. Super. 2008). A plaintiff must plausibly allege that the defendant published either with actual malice (if the plaintiff is a public figure) or negligently (if the plaintiff is a private figure). <u>Id.</u> at 338–42; <u>Dunlap v. Phila. Newspapers, Inc.</u>, 448 A. 2d 6, 13–14 (Pa. Super. 1982).

Given that Viola admits to authoring all but one of the truthseeker comments, this cause of action only applies to the publication of the Muslim Comment. Viola alleges that she did not make the Muslim Comment. Doc. No. 10 ¶ 53. She also alleges that Benton's publication of the

Muslim Comment "portray[ed] her as racist and Islamophobic" and caused her "significant reputational harm" and "actual damages." Id. ¶¶ 97, 110. The Court need not determine whether Viola is a public or private figure and consequently whether negligence or the higher actual malice standard applies at this stage of the case. See, e.g., Trivedi v. Slawecki, No. 4:11-CV-02390, 2012 WL 5987410, at *3 (M.D. Pa. Nov. 28, 2012) (noting that "[t]he classification of a plaintiff as a public or private figure is a question of law to be determined initially by the trial court" but "[t]his question, however, is more appropriately resolved at the summary judgment stage on the basis of record evidence") (citation omitted). Drawing all reasonable inferences in Viola's favor, she has plausibly alleged that Benton may have been negligent in his failure to verify that she was the author of the truthseeker comments. See Doc. No. 10 ¶ 43 (alleging that Benton "did not contact Viola to confirm that she was the author of the comments published by the 'Truthseeker' account, to ask if the comments reflected her actual beliefs about the subject matters referenced or to provide her with an opportunity to respond"); see also id. ¶ 58 (alleging Harvard found that Benton's actions "did not comply with Nieman's Journalistic standards"). For these reasons, Defendants' Motion to Dismiss is DENIED as to Count IV and Count V of the Amended Complaint.

### D.  Intentional Infliction of Emotional Distress (Count VIII) and Tortious Interference with Contractual Relations (Count IX)

Defendants argue only that Viola's claims for intentional infliction of emotional distress (Count VIII) and tortious interference with contractual relations (Count IX) are derivative of her defamation claims and ought to be dismissed with her defamation claims. Doc. No. 12-1 at 50. Because the Court denied Defendants' motion to dismiss the defamation claims, Defendants' Motion to Dismiss is also DENIED as to Count VIII and Count IX of the Amended Complaint.

### E.  Contract Claims

#### 1.  Breach of Contract (Count VI)

"A cause of action for breach of contract must be established by pleading (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." Corestates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. 1999). For a contract to be enforceable, both parties must have "manifested an intention to be bound by its terms" and the terms must be "sufficiently definite to be specifically enforced." Channel Home Ctrs., Div. of Grace Retail Corp. v. Grossman, 795 F.2d 291, 298–99 (3d Cir. 1986) (citing Lombardo v. Gasparini Excavating Co., 123 A.2d 663, 666 (Pa. 1956)). "Additionally, of course, there must be consideration on both sides." Id.

Viola's breach of contract claim fails because she does not allege that an enforceable contract exists. She first argues that the Harvard Privacy Statement (Doc. No. 10-7) functions as a contract because "the website niemanlab.org was governed by the Privacy Statement maintained by Defendant Harvard on its main website" and it "assures users that the data collected will not be shared without the user's permission." Doc. No. 10 ¶¶ 112, 114. She alleges that she agreed to the terms of the Harvard Privacy Statement and relied on its promise of anonymity when leaving comments on the Nieman Lab website, and Benton's actions were a breach of this contract. Id. ¶¶ 117, 118. However, the first paragraph of the Harvard Privacy Statement says:

> This Privacy Policy discloses the privacy practices for www.harvard.edu, the main Harvard University website. Please note that Harvard Schools, Centers, and other Harvard units and affiliates have separate privacy policies.

Doc. No. 10-7 at 1. The Harvard Privacy Statement goes on to add: "Your session and the pages you visit on www.harvard.edu will be tracked, but you will remain anonymous." Id. By its plain

language, the Harvard Privacy Statement applies only to www.harvard.edu, and not to niemanlab.org. Viola's allegations fail to establish that this document constitutes the basis of a contract she formed with Harvard governing her actions and Benton's actions with regards to niemanlab.org. Moreover, even if the Harvard Privacy Statement constitutes a contract between Harvard and Viola, Viola has not plausibly alleged a breach for the reasons discussed <u>infra</u> with regards to her promissory estoppel claim.

Next, Viola argues that Benton breached a contract created by the Basic Rules for Disqus-powered Sites ("BRDPS") (Doc. No. 10-4) and the Basic Rules for Disqus ("BRD") (Doc. No. 10-6) (together, "Disqus Policies"). Doc. No. 10 ¶¶ 115–17. As noted above, Disqus is a third-party application that provides websites with a platform for users to comment on articles. The BRDPS lays out the expectations for websites that utilize Disqus, including that "[u]ser information is for moderation purposes only." Doc. No. 10-4 at 1. The BRD lays out rules for individuals who use Disqus to post comments, including that "[p]osting personally identifiable information" is not allowed. Doc. No. 10-6 at 1. Viola created an account on Disqus governed, per her allegations, by these policies. Viola does not allege that any of these documents constitute an enforceable contract <u>with Defendants</u>. Nor does she allege facts that plausibly support the conclusion that she formed a contract with Defendants memorialized in these documents. Whether she formed a contract with Disqus is not before the Court. Similarly, Viola advanced no claim of third-party beneficiary status in her Complaint, in her Amended Complaint, or in her extensive briefing in opposition to the Motion to Dismiss. She did, for the first time, assert this theory at the hearing on the pending Motion. Under these circumstances, the Court declines to consider this theory in opposition to the Motion. <u>Cf., e.g.</u>, <u>Baker v. Hopeman Bros.</u>, No. 11-01646, 2012 WL 7761420, at *1 n.1 (E.D. Pa. Nov. 9, 2012) (declining to consider

"an argument raised for the first time during oral argument"). Defendants' Motion to Dismiss is ALLOWED as to Count VI of the Amended Complaint.

### 2.   Promissory Estoppel (Count VII)

The elements of promissory estoppel under Pennsylvania law are: "(1) the promisor made a promise that he or she could have reasonably expected to induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; (3) injustice can be avoided only by enforcing the promise." Edwards v. Wyatt, 335 F.3d 261, 277 (3d Cir. 2003) (quoting Crouse v. Cyclops Indus., 745 A.2d 606, 610 (Pa. 2000)).

Viola alleges that "[b]y posting the promise that a user's identity will be kept anonymous while users are accessing their website, Defendant Harvard created in users a reasonable reliance of anonymity to promote the use of its website." Doc. No. 10 ¶ 122. The first three paragraphs of the Harvard Privacy Statement are as follows:

> This Privacy Policy discloses the privacy practices for www.harvard.edu, the main Harvard University website. Please note that Harvard Schools, Centers, and other Harvard units and affiliates have separate privacy policies. By using this website, you are consenting to our collection and use of information in accordance with this Privacy Policy.
>
> **What information do we gather about you?**
> We and our third-party vendors collect certain information regarding your use of www.harvard.edu, such as your IP address and browser type. Your session and the pages you visit on www.harvard.edu will be tracked, but you will remain anonymous. We may use your IP address to identify the general geographic area from which you are accessing Harvard.edu. We connect data from different systems but do not link IP addresses to any personal information. We may also collect other information as described in this policy.
>
> **What do we use your information for?**
> We use the information we gather from you for systems administration purposes, abuse prevention, and to track user trends, and for the other purposes described in this policy. If you send us an email, the email address you provide may be used to send you information, respond to inquiries, and/or other requests or questions. We

will not share, sell, rent, swap, or authorize any third party to use your email address
for commercial purposes without your permission.

Doc. No. 10-7 at 1 (emphasis added). Throughout the Amended Complaint, Viola points to the

phrase "you will remain anonymous" as a promise from Defendant Harvard that it would not

publish or reveal her personal information (i.e., her name and her employer) when she chose to

post anonymous comments on the Nieman Lab website. Doc. No. 10 ¶¶ 30, 122. As the Court

notes above, the Harvard Privacy Statement does not apply to niemanlab.org; rather, it is

explicitly limited to www.harvard.edu. But even if it did apply to the Nieman Lab, the Harvard

Privacy Statement does not make the promise Viola alleges. Rather, the promise it makes is that

an individual will remain anonymous with regards to information collected by Harvard and third

parties "regarding your use of www.harvard.edu, such as your IP address and browser type" as

well as "[y]our session and the pages you visit." Nothing about the paragraph applies to

comments posted to articles or otherwise constitutes an all-encompassing promise of anonymity.

While Defendant Harvard promises to not "share, sell, rent, swap, or authorize any third party to

use your email address for commercial purposes without your permission," Viola does not allege

that her personal information was used in this way. Due to the lack of any promise upon which

Viola could reasonably rely, Viola's claim for promissory estoppel fails as to the Harvard

Privacy Statement.

The Court next turns to whether Viola sufficiently alleges a claim for promissory

estoppel based on the Disqus Policies. Defendants note that "Viola's promissory estoppel claim

is entirely based upon Harvard's Privacy Statement," Doc. No. 12-1 at 54, and they are correct

that Count VII of the Amended Complaint does not explicitly mention the Disqus Policies

alongside the Harvard Privacy Statement. See Doc. No. 10 ¶¶ 121–27. However, given (a) the

policy of the federal rules to permit liberal pleading and amendment; (b) Viola did put forth the

23

argument in her papers that "[b]ased on the language of the Harvard Privacy Statement, <u>the BRD and BRDPS</u>, Viola's reliance on Harvard's promise to maintain her anonymity was reasonable and foreseeable," Doc. No. 15 at 34 (emphasis added); (c) Defendants had a fair opportunity to respond to the argument; and (d) Count VII of the Amended Complaint "realleges and reavers the preceding paragraphs as if fully rewritten and restated herein," Doc. No. 10 ¶ 121, the Court overlooks Viola's inartful pleading and addresses the merits of this argument.

Viola alleges that she "was aware of the terms of the BRD, agreed to them and relied on them when publishing comments through the Disqus platform." <u>Id.</u> ¶ 25. However, the BRD cannot support a claim for promissory estoppel. The BRD states, in relevant part:

> Disqus doesn't moderate or manage the communities that use Disqus, but using Disqus to do any of the following things breaks our Terms of Service and appropriate action (which can include removing a comment or discussion, resetting a profile, or banning an account) will be taken to enforce them.
>
> The following are not allowed anywhere on Disqus: . . .
>
> **Posting personally identifiable information**
> Examples of protected information: credit card number, home/work address, phone number, email address, social security number. Real name isn't currently covered.

Doc. No. 10-6 at 1. The Amended Complaint does not allege that Benton posted Viola's personal information "anywhere on Disqus." Moreover, the BRD states that a person's "[r]eal name" (which is what Benton ultimately published on Twitter) is not considered a piece of personally identifiable information for the purpose of this policy. The BRD does not set forth a promise of anonymity upon which Viola can rely. Her claim fails as to the BRD.

Turning next to the BRDPS, Viola alleges the following: First, "[a]s a website that uses the Disqus platform, Nieman Lab, and by extension Defendant[s] . . . are bound by the BRDPS." Doc. No. 10 ¶ 26. Second, she points to the following language from the BRDPS:

24

Websites or website representatives, including site moderators, publishing inappropriate content or exhibiting inappropriate behaviors in connection with their use of the Service may have their Disqus account and/or Disqus forum suspended or terminated.

The following are not allowed on sites that use Disqus: . . .

**Deceitful data collection or distribution**
User information is for moderation purposes only and collecting any information in a misleading way is prohibited. Distribution of personal identifiable information is prohibited.

See id. ¶ 22; Doc. No. 10-4 at 1. Viola claims that she "agreed to the terms of and reasonably relied upon the assurances of the Harvard Privacy Policy and the Disqus Policies when accessing and commenting on the website." Doc. No. 10 ¶ 117. And finally, her "reliance was reasonable and expected under the terms of the Harvard Privacy Statement and Disqus's BRDPS which she understood were binding for use of the Nieman Lab website." Id. ¶ 33.

Evaluating under the standard applicable to the pending motion to dismiss, these allegations are sufficient to plausibly state a promissory estoppel claim based on the BRDPS. Given that the Nieman Lab used Disqus as a platform, Defendants could reasonably expect Viola to rely upon the BRDPS as a promise of how her information would be treated when she left comments on Nieman Lab articles. Viola alleges that she took specific action—commenting on a Nieman Lab article under the pseudonym truthseeker—based on the promise that her user information would be used for "moderation purposes only," which was violated when Benton posted her information on Twitter. Thus, as to the BRDPS, Defendants' Motion to Dismiss Count VII of the Amended Complaint is DENIED.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (Doc. No. 12) is ALLOWED as to Plaintiff's claims for publication of private facts, intrusion upon seclusion, false light, and

breach of contract (Counts I, II, III, and VI of the Amended Complaint) and DENIED as to

Plaintiff's claims for libel, defamation by implication, promissory estoppel, intentional infliction

of emotional distress, and tortious interference with contractual relations (Counts IV, V, VII,

VIII, and IX of the Amended Complaint). Defendants shall file an Answer to the portions of the

Amended Complaint that remain pending within fourteen days of this Order. The Clerk shall

schedule a Rule 16 conference in the ordinary course.


SO ORDERED.


 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge